**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

DARRYL W. MEANS,                         §
                                         §
            *Plaintiff*                   §
                                         §
*versus*                                  §          CIVIL ACTION NO. H-07-1278
                                         §
MICHAEL J. ASTRUE, Commissioner          §
of the Social Security Administration,   §
                                         §
            *Defendant.*                  §

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Darryl W. Means' ("Means") and Defendant Michael

J. Astrue's, Commissioner of the Social Security Administration ("the Commissioner"), cross-

motions for summary judgment.  Means appeals the determination of an Administrative Law Judge

("ALJ") that he is not entitled to receive Title II disability insurance benefits or Title XVI

supplemental security income benefits.  *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A).  Having

reviewed the pending motions, the submissions of the parties, the pleadings, the administrative

record, and the applicable law, it is ordered that Means' Motion for Summary Judgment (Docket

Entry No. 14) is denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 15)

is granted, and the Commissioner's decision denying benefits is affirmed.

I.     ___*Background*___

On June 18, 2003, Means filed an application for disability insurance benefits with the Social

Security Administration (SSA), claiming that he had been disabled and unable to work since he was

born in April 1963.  (R. 256).  Means alleges that he suffers from a learning disorder, left ear

impairment, mild mental retardation, history of alcoholism, and status post-knee surgery.  (R. 16).

After being denied benefits initially and on reconsideration, on September 4, 2003, Means requested an administrative hearing before an ALJ to review the decision.  (R. 43, 45-47, 50-55).

A hearing was commenced on July 28, 2004, before ALJ John Jarrett.  (R. 191-199).  The hearing was suspended, however, until fluid in Means' ear cleared up to allow him to hear the proceedings.  (R. 193-198).  A hearing resumed on November 2, 2004, in Houston, Texas, at which the ALJ heard testimony from Means, his mother, Leoylian Means, a vocational expert ("VE"), Susan Rapant, and a medical expert, who is board certified in psychology, Dan Hamill, Ph.D. ("Dr. Hamill").  (R. 200-252).  In a decision dated November 26, 2004, the ALJ denied Means' application for benefits.  (R. 11-16).  Means, on December 13, 2004, appealed the decision to the Appeals Council of the SSA's Office of Hearings and Appeals to review the ALJ's determination.  (R. 6). The Appeals Council denied Means' request to review the ALJ's determination.  (R. 3-5).

Means timely filed a civil action in this court on March 16, 2005, seeking judicial review of the Commissioner's denial of his claim for benefits.  *See Means v. Barnhart*, Civil Action No. H-05-889 (S.D. Tex, August 1, 2005).  The Commissioner submitted an unopposed motion for remand, asserting that an ALJ should reconsider whether Means has past relevant work, and if not, proceed to step five of the sequential evaluation process.  *See id*.  The court granted the Commissioner's motion, and the case was remanded on August 1, 2005.  *See id.*

On February 22, 2006, the Appeals Council ordered a hearing to be conducted to determine whether Means had any work that qualifies as past relevant work.  (R. 256).  A hearing was held on October 18, 2006, in Houston, Texas, at which ALJ Gerald Meyer heard testimony from Means, his mother, Leoylian Means, and a VE, Patricia A. Cowen.  (R. 375-392).  The ALJ noted that during his prior appeal, Means had filed a subsequent claim for Title XVI benefits.  (R. 256).  The ALJ

condensed the current and subsequent claims as duplicate, and associated the claim files.  (R. 256).

In a decision dated November 24, 2006, the ALJ denied Means' application for benefits.  (R. 256-

260).  Means filed this case on April 12, 2007, seeking judicial review of the Commissioner's denial

of his claim for benefits. *See* Docket Entry No. 1.

II.   *Analysis*

    A.   *Statutory Bases for Benefits*

       SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues.

*See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001).

The SSI Program is a general public assistance measure providing an additional resource to the aged,

blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R.

§ 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C.

§§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment

for any period of disability predating the month in which he applies for benefits, no matter how long

he has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also*

20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements
> for eligibility, the earliest month for which we can pay you benefits is the month
> following the month you filed the application.  If you file an  application after the
> month you first meet all the other requirements for eligibility, we cannot pay you for
> the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, June 2003, fixes the earliest

date from which benefits can be paid.  Eligibility for SSI payments, however, is not dependent on

insured status.  *See* 42 U.S.C. § 1382(a).

3

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

B.    ***Standard of Review***

            1.    ***Summary Judgment***

The court may grant summary judgment under Fed. R. Civ. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the

nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, a court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F. 3d 796, 798 (5th Cir. 2000).

## 2.    *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and

less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the court to resolve. *Id.*

### C.    *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 416.920(d).

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 416.920(e).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the plaintiff can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that cannot, in act, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5 th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209

F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98, (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical an laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if the impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan,* 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied.  *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    The claimant has not engaged in substantial gainful activity since June 18, 2003 the date the application was filed (20 C.F.R. 416.920(b) and 416.971 *et seq.*).

2.    The claimant has the following severe impairments: hearing loss and borderline intellectual functioning (20 C.F.R. 416.920(c)).

3.    The claimant does not have an impairment or combination or impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

4.    After careful reconsideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of medium work. He can stand/walk/sit for a total of 6 hours in an 8-hour workday. He can lift/carry 50 pounds occasionally and 25 pounds frequently. He cannot work around loud or extremely loud noises due to his hearing impairment. Functionally, he will need to work in a simple routine work environment.

5.    The claimant is capable of performing past relevant work as a warehouse worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 416.965).

6.    The claimant has not been under a "disability," as defined in the Social Security Act, since June 18, 2003 (20 C.F.R. 416.920(f)), the date the application was filed.

(R. 260).

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Means' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D.   *Issues Presented*

Means contends that the ALJ committed error at step three of the evaluation process by failing to find that Means met or equaled Listing 12.05C (*i.e.*, mental retardation).  *See* 20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.05.  Means argues that by the ALJ's own findings, specifically, his findings that Means has severe hearing impairment and borderline to mild retardation, the ALJ should have found that the elements of Listing 12.05C were satisfied.  *See* Docket Entry No. 14.  The Commissioner disagrees with Means' contentions, maintaining that he does not satisfy the threshold requirements of Listing 12.05C; that is, Means must show significant sub-average adaptive functioning.  *See* Docket Entry No. 15.

### E.   *Review of the ALJ's Decision*

#### 1.   *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 404.1520(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of such a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530-31; *Selders,* 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See. id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet all of the specified medical criteria, no matter how severe, does not qualify. *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical

11

findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R.

§§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

(1)(I)  If you have an impairment that is described in the Listing of Impairments in
Appendix 1 of Subpart P of this chapter, but–

    (A)  You do not exhibit one or more of the medical findings specified in
the particular listing, or

    (B)  You exhibit all of the medical findings, but one or more of the
findings is not as severe as specified in the listing;

(ii)  We will nevertheless find that your impairment is medically equivalent to that
listing if you have other medical findings related to your impairment that are
at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under

the 'equivalence' step by showing that the overall functioning impact of his unlisted impairment or

combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531.

Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v.*

*Shalala*, 1 F.3d 357, 364 (5th Cir. 1993).

A review of the medical records submitted in connection with Means' administrative hearing

reveals that Means reported injuring his knee while working on January 8, 2002.  (R. 173).  On

January 17, 2002, Means visited Joseph O. Muscat, M.D. ("Dr. Muscat") to have his right knee

evaluated.  (R. 172).  Dr. Muscat observed that Means' right knee showed large swelling and that

the knee was very tender.  (R. 172).  Further, the knee showed symptoms of having a meniscus tear

after application of the McMurray Test[1].  (R. 172).  During the examination, Means lacked 10

degrees of extension and could flex 120 degrees.  (R. 172).  Also, Means appeared to have laxity to

---

[1] The "McMurray Test" is the rotation of the tibia on the femur to determine injury to meniscal structures.
*See* STEDMAN'S MEDICAL DICTIONARY 1805 (27th ed. 2000).

his anterior cruciate ligament ("ACL") with no firm endpoint.  (R. 172).  Dr. Muscat's initial

impression after this visit was that Means had a meniscal tear and probable ACL tear.  (R. 172).

On January, 23 2002, Means underwent magnetic resonance imaging ("MRI") on his right

knee at Kingwood Medical Center.  (R. 184).  The results of the MRI showed an ACL tear, tears in

the posterior horn of the medial and anterior horn of the lateral menisci, extensive bone contusion[2]

in the lateral tibial plateau posteriorly and focal bone contusion in the medial femoral condyle, and

a large amount of joint effusion.  (R. 184).

Means returned to Dr. Muscat's office on January 25, 2002.  (R. 171).  Dr. Muscat observed

that Means had a mild to moderate effusion, or collection of fluid in the knee-area.  (R. 171).

Further, he was stable to varus[3] and valgus[4] stress.  (R. 171).  Also, after confirming tears in the

medial and lateral menisci and the anterior cruciate ligament, Dr. Muscat recommended

arthroscopy,[5] anterior cruciate ligament reconstruction, and medial meniscectomy[6] versus meniscal

repair.  (R. 171.) After detailing the benefits of the surgery, Means and his mother gave their

informed consent to the surgery.  (R. 171).  Means underwent a successful knee arthroscopy

performed by Dr. Muscat on February 5, 2002.  (R. 179).

---

[2]  A "contustion" is any mechanical injury resulting in a hemorrhage beneath unbroken skin. Commonly
referred to as a bruise.  *See* STEDMAN'S, *supra*, at 406.

[3]  "Varus" means the knee is bent or twisted inward toward the midline of the limb or body.  *See* STEDMAN'S,
*supra*, at 1931.

[4]  "Valgus" means the knee is bent or twisted outward away from the midline or body.  *See* STEDMAN'S,
*supra*, at 1926.

[5]  "Arthroscopy" is an endoscopic examination of the interior of a joint.  *See* STEDMAN'S, *supra*, at 151.

[6]  "Meniscectomy" is the excision of a meniscus, usually from the knee joint.  *See* STEDMAN'S, *supra*, at
1091.

13

On February 8, 2002, Means returned to Dr. Muscat's office for his post-surgery follow-up. (R. 170).  Dr. Muscat observed that the incisions were well-healed, had no redness or discharge, that his calf was supple, soft, and non-tender.  (R. 170).  Dr. Muscat's overall impression was that Means was doing well and should return the following week for suture removal.  (R. 170).  Means did return for the suture removal appointment on February 14, 2002, and Dr. Muscat noted Means was doing very well post-surgery.  (R. 170).

On May 20, 2002, Means was evaluated at the Westside Bone and Joint Clinic by Dr. Martin L. Bloom ("Dr. Bloom").  (R. 125).  This evaluation was for the Texas Worker's Compensation Commission to determine if Means had reached his maximum medical improvement, enabling him to return to work.  (R. 126).  In this evaluation, Dr. Bloom opined that Means was not yet maximally improved, and anticipated this to occur by August 5, 2002.  (R. 125).

Six and a half weeks after Means' knee surgery, Means returned to Dr. Muscat's office. (R. 168).  Dr. Muscat reported that Means was experiencing occasional soreness and pain particularly with activity but was developing well in therapy.  (R. 168).  In Means' physical examination, Dr. Muscat found that Means had full extension, could flex up to 110 degrees, and had good pulses and capillary refill. (R. 168). Also, Means' motor and sensory exams were intact and he had a crisp, firm endpoint to his ACL.  (R. 168).  Again, Dr. Muscat noted that Means was doing well.  (R. 168). On May 23, 2002, Dr. Muscat allowed for Means to return to work at a light duty status and to resume physical therapy.  (R. 166).

In July 2002, Dr. Muscat prescribed Means needed an anterior cruciate ligament brace to help prevent further injury and to give Means' knee stability.  (R. 164).

14

On September 18, 2002, Means returned to Dr. Bloom for an evaluation to determine Means'
level of medical improvement.  (R. 124).  Dr. Bloom found that Means had a normal stance and gait.
(R. 123).  Means also exhibited a range of motion of the right knee from 0-105 degrees.  (R. 123).
Means' thigh circumference was measured at 15-cm, the superior pole above the patella[7] was 51.5
cm on the right and 52 cm on the left, the calf measured at 15 cm, and below the inferior pole of the
patella was bilaterally symmetrical at 33 cm.  (R. 123).  Finally, the anterior draw and pivot shift[8]
tests were both 1+ positive.  (R. 123).  After weighing all these factors, Dr. Bloom concluded that
three percent of Means' whole person was impaired, and he had reached his maximum medical
improvement.  (R. 124).

On November 18, 2002, Means attended his final post-operation follow-up with Dr. Muscat.
(R. 161).  Dr. Muscat concluded that the portal incision sites were well healed with no redness or
discharge, and that Means' motor and sensory exams remained intact.  (R. 161).  Means also had no
signs of lymphadenopathy.[9]  (R. 161).  Dr. Muscat's impression was that Means was nine percent
impaired in his lower extremities, and four percent impaired in his whole person.  (R. 161). Dr.
Muscat concluded that Means had reached maximum medical improvement with four percent whole
person impairment.  (R. 161).

---

[7]  "Patella" is the large sesamoid bone, in the combined tendon of the extensors of the leg, covering the
anterior surface of the knee. It is commonly referred to as the knee-cap.  *See* STEDMAN'S, *supra*, at 1331.

[8]  "Pivot Shift Test" is a maneuver to detect a deficiency of the anterior cruciate ligament of the knee; when
the knee is extended, a sudden subluxation of the lateral tibial condyle upon the distal femur is positive.  *See*
STEDMAN'S, *supra*, at 1807.

[9]  "Lymphadenopathy" is any disease process affecting a lymph node or lymph nodes.  *See* STEDMAN'S,
*supra*, at 1039.

On June 20, 2003, Means was referred by the Texas Rehabilitation Commission to Jim C. Whitley, Ed.D. ("Dr. Whitley") for a psychological evaluation. (R. 128). Dr. Whitley was to determine if Means had any underlying psychological problems that would interfere with competitive employment. (R. 128). Dr. Whitley noted that Means arrived at his appointment alone and on-time. (R. 128). Also, no signs of oppositional behavior were noted. (R. 128). Means also smiled in passing at the appropriate times, and Means' eye contact, voice quality, and body posture all reflected some constricture and vacillating ego strength. (R. 128).

After observing Means' behavior, Dr. Whitley examined Means' mental status. Dr. Whitley noted that Means' motorical behavior was lethargic. (R. 128). Dr. Whitley found that Means' long-term and short-term memory was reasonably intact, and he was oriented to person, time, and place. (R. 128). Means reported that he did not suffer from hallucinations, delusions, or suicidal thought, but had recently quit drinking alcohol. (R. 128). Means further reported that he had never been in treatment or hospitalized in a psychiatric hospital. (R. 128). Also, Means' thinking processes were concrete but free of loosening of associations, tangential thinking and/or florid thought processes. (R. 128). Dr. Whitley further noted that Means was in resource classes throughout his school experience. (R. 129).

Dr. Whitley proceeded from his behavior observation and performed five tests on Means. (R. 129). The first test was the Bender-Gestalt Visual–Motor Test.[10] (R. 129). Means performed well, although he had difficulty with angulation. (R. 129). Second, Dr. Whitley placed Means'

---

[10] "Bender-Gestalt Test" is a psychological test used by neurologists and clinical psychologists to measure a person's ability to visually copy a set of geometric designs; useful for measuring visuospatial and visuomotor coordination to detect brain damage. *See* STEDMAN'S, *supra*, at 1799.

ability on the Leiter International Performance Scale.[11]  (R. 130).  Dr. Whitley determined that Means' Intelligence Quotient was 71.  (R. 130).  This places Means in the borderline range of cognitive functioning within the 3rd percentile rank of the general population.  (R. 130).  Third, Dr. Whitley applied the Wide-Range Achievement Test.  (R. 130).  This test measures the grade level equivalent that at which a patient is functioning.  (R. 130).  Means performed at a 2nd grade level in arithmetic, a 5th grade level in spelling, and a 6th grade level in reading. (R. 130).  Fourth, Dr. Whitley utilized the Thematic Apperception Technique in which he measured Means' responses to stimuli.  (R. 130).  Means frequently misinterpreted environmental cues and had some feelings of alienation, isolation, and loss.  (R. 130).  Dr. Whitley reported that Means had no conflict with authority figures but was easily overwhelmed and had very poor defenses with regard to dealing with constructive criticism.  (R. 130).  Fifth and finally, Dr. Whitley performed the Rorschach Inkblot Technique.[12]  (R. 130).

At the conclusion of the five tests, Dr. Whitley determined that the number of responses that the patient gave would suggest that his level of cognitive functioning is in the below average range. (R. 130).  Means exhibited some indication of impulsivity.  (R. 130).  Content analysis reflected an out of proportion number of animal responses which typically reflects emotional regression, and some indication of addictive qualities existed.  (R. 130).  No thought disorder, however, was noted.

---

[11] "Leiter International Performance Scale" is a nonverbal test for measuring intelligence that contains norms for each age between 2 and 18 . . . . occasionally used for patients who are blind, deaf, or verbally handicapped.  *See* STEDMAN'S, *supra*, at 1596.

[12] "Rorschach Inkblot Technique" is a projective psychological test in which the subject reveals his or her attitudes, emotions, and personality by reporting what is seen in each of 10 inkblot pictures. *See* STEDMAN'S, *supra*, at 1808.

(R. 130). Dr. Whitley summarized that Means suffered from alcohol abuse, phonological disorder,[13]

math disorder,[14] borderline intellectual functioning, bilateral hearing loss, etiology[15] unknown,

educational, vocational and financial problems, and a Global Assessment Functioning ("GAF") score

of 55.[16]  (R. 131).

On April 28, 2003, Means was examined by the Texas Rehabilitation Commission to

measure the extent of his long-standing hearing loss.  R. 139). The examiner concluded, after

conducting the Puretone Audiometry test,[17] that Means had lost 40-60 decibels of hearing over his

lifetime.  (R. 139).  This physician listed his hearing loss as temporary and conductive.[18]  (R. 139).

---

[13] "Phonological Disorder" is a communication disorder of unknown etiology, characterized by failure to use age- and dialect-appropriate sounds in speaking, with error occurring in the selection, production, or articulation of sounds. The most common errors are omissions, substitutions, and distortions of speech sounds. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 531 (29th ed. 2000).

[14] "Mathematics Disorder" is a learning disorder in which the skill affected is mathematical calculation or reasoning. *See* DORLAND'S, *supra*, at 530.

[15] "Etiology" is the science and study of the causes of disease and their mode of operation. *See* STEDMAN'S, *supra*, at 624.

[16]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms.  A GAF rating of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *See id.* at 34.

[17] "Puretone Audiometry test" is the measurement of hearing based on listening to different frequencies expressed in decibels relative to the normal threshold and usually covering frequencies from 250-8000 Hz. *See* STEDMAN'S, *supra*, at 168-69.

[18] "Conductive hearing loss" is a form of hearing impairment due to a lesion in the external auditory canal or middle ear. *See* STEDMAN'S*, supra*, at 790.

The examiner recommended that Means get a bilateral myringoctomy[19] and PET placement to normalize Means' hearing. (R. 139).

Also, on April 28, 2003, Means was examined by an audiologist, Jennifer Redford ("Redford"), at the Houston Ear, Nose, and Throat Clinic. (R. 134-35). Means completed a questionnaire concerning his hearing problem in his right ear, only checking that he avoided situations due to his hearing impairment and that he did not always understand what was being said when spoken to. (R. 134). He also reported excessive wax. (R. 134). Redford proffered that Means experienced moderate to moderately-severe conductive hearing loss. (R. 134).

On July 28, 2003, Nancy Wilson, Ph.D. ("Dr. Wilson") assessed Means' mental residual functional capacity. (R. 142). Dr. Wilson found Means to be moderately limited in his ability to remember locations and work-like procedures, his ability to carry-out detailed instructions, maintain his attention and concentration for extended periods, maintain a schedule or routine, and his ability to make work-related decisions. (R. 142). Dr. Wilson also found Means to be moderately limited in his ability to complete a workday or workweek with no interruptions from psychological issues. (R. 143). Finally, Dr. Wilson concluded that Means was moderately limited in his ability to ask simple questions, respond to criticism, to travel in unfamiliar places, and set realistic goals or make plans independently of others. (R. 143). Dr. Wilson found that Means had borderline functioning and could carry out only simple instructions, and make simple decisions. (R. 143). Dr. Wilson also determined that Means could respond appropriately to changes in a routine work setting, accept instructions, and concentrate for extended periods of time. (R. 143).

---

[19] "Myringectomy" is an excision of the tympanic membrane. *See* STEDMAN'S, *supra*, at 1177.

On July 26, 2004. Means was referred to Drs. Ted Jolly ("Dr. Jolly") and Tomas G. Soto ("Dr. Soto") for evaluation of Means' cognitive and academic levels of reasoning.  (R. 186-190). Drs. Jolly and Soto utilized the Wechsler Adult Intelligence Scale-R ("WAIS-R"),[20] Wide Range Achievement Test-3 ("WRAT-3"), and a clinical interview.  (R. 143).  Drs. Jolly and Soto observed that Means had much difficulty understanding test questions, and Means' working pace was slow and inconsistent.  (R. 143).  Also, Drs. Jolly and Soto found that Means' insight and judgment were moderately impaired.  (R. 143).

According to the WAIS-R Test, Means obtained a full scale IQ score of 70, which placed him in the upper end of mild retardation.  (R. 188).  His scores ranged from a 68 on the verbal portion of the test and a 75 on the performance portion.  (R. 188).  In the verbal domain, Means was more productive in tasks such as tests of abstract reasoning.  (R. 188).  In contrast, he was markedly impaired in rote learning memory, numerical reasoning ability and expressed understanding of social conventions.  (R. 188).  Means was also unable to memorize beyond three random digits forward and two random digits backward.  (R. 189).  Drs. Jolly and Soto observed that Means was in the lower borderline intelligence category for non-verbal domain.  (R. 189).

On the WRAT-3 Test, Means ranged from a 3rd grade level in arithmetic, a 4th grade level in reading, and a 5th grade level in spelling.  (R. 189).  These results revealed that Means was academically depressed and unevenly developed.  (R. 189).  Drs. Jolly and Soto noted that Means would have trouble writing sentences and paragraphs without assistance, and that Means was functionally illiterate.  (R. 189).

---

[20]  "Wechsler Adult Intelligence Scale" is continuously revised and updated standardized scales for measurement of general intelligence.  *See* STEDMAN'S, *supra*, at 1596.

Drs. Soto and Jolly summarized Means' functional intelligence as in the upper-end of mild retardation.  (R. 190).  Drs. Soto and Jolly opined that Means' hearing impairment limited his ability to following instructions.  (R. 190).  Finally, Drs. Soto and Jolly reported that Means had a desire to work, but that Means became confused and forgetful of what he was supposed to be doing.  Drs. Jolly and Soto rated Means' prognosis as guarded, and noted that Means needed someone else to help manage his funds should he work.  (R. 190).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight than that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for

determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621;

*Newton*, 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, there is

substantial evidence in the record to support the ALJ's determination that Means suffered from

impairments which did not meet or equal the requirements of a listing.  Means claims that the ALJ

erred by not finding that the elements of Listing 12.05C were satisfied by combination of his mental

retardation and severe hearing impairment.  *See* Docket Entry No. 14, at pp. 5-7.  The Commissioner

contends that Means does not meet the threshold requirements of Listing 12.05C.  Particularly, the

Commissioner contends that there is no evidence in the record that Means meets the Listing 12.05C

requirement that the diagnostic description be met by exhibiting significant sub-average intellectual

functioning or suffering deficits in adaptive functioning.  *See* Docket Entry No. 15, at p. 6.  The

Commissioner concedes that Means' hearing loss is severe under 12.05C.  *See* Docket Entry No. 15,

at p. 5.  Further, neither party contends, nor did the ALJ find that Means' post-surgery knee pain was

severe under the listing.  *See* Docket Entry No. 15, at p. 6.  Therefore, the only issue is whether

Means' mental impairment is severe under Listing 12.05C.

>           **2.       *Mental Retardation Listing 12.05C***

In the case at bar, the sole contention between the parties is that the ALJ failed to find that

Means' mental condition meets the requirements of Listing 12.05C (*i.e.*, mental retardation).  *See*

Docket Entry No. 15, at p. 6.  The determinations by the examining psychologists, Drs. Jolly and

Soto, that Means falls within the mild mental retardation range is not dispositive of the issue.  Listing

12.05C provides:

12.05   Mental Retardation:   Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

\* \* \*

C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

\* \* \*

*See* 20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.05C.

The Commissioner concedes that Means' hearing impairment satisfies the second prong of the above-stated listing.  *See* Docket Entry No. 15, at p. 5.  The Commissioner, however, argues that even though Means' conditions appear to meet the listing requirements, the evidence contradicts this finding because Means functioned above a level commensurate with deficits in adaptive functioning. *See* Docket Entry No. 15, at p. 6.  To meet the requirements of Listing 12.05C, a claimant must show: "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before the age 22; (3) a physical or other mental impairment imposing additional and significant work-related limitation of function."  *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).  The ALJ found Means had borderline intellectual functioning, so Means need only exhibit deficits in adaptive functioning[21] manifested prior to the age of twenty-two.  *See id.* at 900.

---

[21]   Adaptive Functions include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R. pt 404, Subpt. P, App. 1 § 12.00(C)(1).

23

In the present case, Means was unable to establish that he had such mental deficiencies, prior to reaching age twenty-two, and, further failed to display the adaptive functioning deficits necessary to meet the impairment listing set forth in 12.05C.  Drs. Jolly and Soto found that Means had elementary school level reading, spelling, and arithmetic, meaning Means far underperforms compared to his actual age.  (R. 189).  The record, however, demonstrates that Means completed high school, somewhat contradicting his academic performance for Drs. Jolly and Soto.  (R. 187).  Also, the determination reached by Dr. Whitley from Means' medical history reported that Means is able to drive, be on time for appointments, and dress appropriately.  (R. 128).  Also, Means testified that he attends church on a weekly basis, understands the sermons, performs household chores, (*e.g.,* cooking light meals and washing laundry and dishes), and builds bird houses and "stuff" to occupy his day.  (R. 237, 239, 389).  Finally, Means was able to pass a written driver's test on his fifth try to obtain his driver's license.  (R. 383).  This evidences that Means' condition does not comport with the limitations in adaptive functioning generally.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 42 (4th ed. 2000); *see generally Hoelck v. Astrue*, 261 Fed. Appx. 683, 686 (5th Cir. 2008).

The other factor that weighs heavily in favor of a finding that Means' adaptive functioning is sufficient as to not be disabled is his relatively extensive work experience.  (R. 95).  Means has worked many jobs successfully in the last fifteen years.  (R. 95).  Means worked as a car washer, cook, housekeeper, kitchen assistant, and a stocker at various points in the last fifteen years.  (R. 95).  Further, Dr. Whitley opined that Means' goal of returning to the furniture business was "reasonable and achievable."  (R. 131).  Also, there is no indication in the record evidence that Means has ever been terminated from employment due to his mental capacity, only his former drinking problem.

24

(R. 129).  Means' fifteen-plus years of working experience while he suffered from the alleged

disability greatly evidences retention of the ability to work presently.  *See Vaughan* v. *Shalala*, 58

F.3d 129, 131 (5th Cir. 1995).  Despite Means' obvious and recorded mental deficiencies, his

previous work experience nonetheless constitutes additional *indicia* militating against a finding that

Means is adaptive functioning deficient to a degree that would be considered disabling.  *See*, *e.g.*,

*Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

The ALJ addressed Means' mental limitations and found that Means was "mildly mentally

retarded," and doubted the credibility of Means' testimony of the severity of his mental and physical

impairments. (R. 259-262).  The ALJ summarized Means' mental limitations as follows:

> In March 2003, the claimant underwent a psychological consultative evaluation. Dr.
> Whitley indicated that the claimant was impaired intellectually but going back to the
> furniture business would be a good work place for the claimant. In a February 2003
> mental residual capacity assessment, Dr. Wilson found that the claimant could
> understand, remember, and carry out simple instructions, and respond appropriately
> to change in a routine work setting. A psychological consultative evaluation in July
> 2004, revealed a Full Scale IQ score of 70, a Verbal IQ score of 68 and a
> Performance IQ score of 75 placing him in the upper end of mild mental retardation.
> Dr. Jolly noted that the claimant was functionally illiterate and for all practical
> purposes he would not be able to read and write most simple and elementary verbal
> concepts.  His severe hearing loss hampers his ability to follow instructions.
>
> A review of the evidence does not fully support the degree of pain and limitation
> alleged by the claimant.  While he testified to significant pain, he did not testify to
> taking an inordinate amount of pain medication.  He has not sought emergency room
> care on a frequent basis.  The claimant reported daily activities of cooking, cleaning,
> driving, and taking care of his personal needs.  Giving him every benefit of the doubt,
> the undersigned finds the claimant's testimony to be unsupported by the objective
> findings and not credible to the extent alleged.

(R. 259-260) (internal citations omitted).

In sum, the ALJ properly found that in reliance upon the medical evidence, including the

conclusions of the treating and consulting physicians; the testimony of vocational experts; and

Means' testimony as to his capabilities, that Means' alleged mental impairment did not, singly or in combination with his hearing and knee impairments, prevent him from performing light to medium unskilled jobs found to exist in significant numbers in the national economy.

### 3.   *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Sharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a claimant alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley v. Charter*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*  It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir.2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F. 3d at 164 n.18.

Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir.1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir.1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir.1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

26

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally, the mere existence of pain does not automatically bring a finding of disability.  *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.3d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.3d at 706.  However, and ALJ may discount subjective complaints as inconsistent with other evidence in the record.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Means testified regarding his hearing impairment, pain post-knee surgery, and his mental impairment.  (R. 214-16, 232-240).  The ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Means' pain, and determined that the alleged limitations are not supported by the evidence because Means finished high school, has worked many jobs, and retains the ability to work again.  (R. 259-260).  The ALJ's finding is supported by the medical records.  The objective medical evidence, as summarized above, indicates that Means is capable, despite his limitations, of returning to work in the furniture industry.  (R. 131).

27

Finally, the Court does not doubt that Means suffers from pain; however, the records do not support a finding that Means' knee pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  Accordingly, there is substantial evidence that supports the ALJ's finding that Means' subjective reports of pain do not rise to the level of disability.

### 4.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . .

42 U.S.C. §§ 423(d)(2)(A), 1382(a)(3)(B).  The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform the work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternative work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*. 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" ("RFC") must be assessed.  *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  This term of art merely represents an individual's ability

to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 416.945.  RFC combines a medical assessment with the descriptions by physicians, the claimant, or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 416.945.

When a claimant's RFC is sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 416.920.  The testimony of a vocational expert is valuable in this regard, as "[h]e is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d at 132.

In evaluating a claimant's RFC, the Fifth Circuit has looked to SSA rulings ("SSR").  *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.*  In *Myers*, the Fifth Circuit relied on SSR's addressing RFC and exertional capacity. *See id.*  In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC assessment is a function-by-function assessment based on all of the relevant evidence of an individual's ability to do work-related activities.  However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work . . . .  RFC involves both exertional and non-exertional factors.  Exertional

> capacity involves seven strength demands: sitting, standing, walking, lifting,
> carrying, pushing, and pulling. Each function must be considered separately.  In
> assessing RFC, the adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular and continuing
> basis . . . . The RFC assessment must include a resolution of any inconsistencies in
> the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further
commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-bu-
> function assessment based upon all of the relevant evidence of an individual's ability
> to perform work-related activities. . . .   The impact of an RFC for less than a full
> range of sedentary work is especially critical for individuals who have not yet
> attained age 50.   Since age, education, and work experience are not usually
> significant factors in limiting the ability of individuals under age 50 to make an
> adjustment to other work, the conclusion whether such individuals who are limited
> to less than the full range of sedentary work are disabled will depend primarily on the
> nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR

96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that

the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  To determine

that a claimant can do a given type of work, the ALJ must find that the claimant can meet the job's

exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir.

1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at bar, the ALJ found that Means had the RFC for a range of medium work.

(R. 259).  The ALJ restricted Means' RFC, however, by indicating that he "will need to work in a

simple routine work environment," and "he cannot work around loud or extremely loud noises due

to his hearing impairment."  (R. 259).  Moreover, due to the limitations the ALJ placed on Means'

RFC, the ALJ consulted a VE to determine the extent to which these limitations eroded the range

of medium work occupational base.  The ALJ asked the following hypothetical question to the VE:

> [Means] has the ability to complete a normal work day and a work week without
> interruptions from any psychological based symptoms. He's capable of performing
> at a consistent pace without unreasonable breaks or rests from any psychological or
> mental impairments. Want him to avoid working around hazardous materials or
> machinery where there's, where there's a loud noise or loud noises, because of the,
> of the problems that he has in his right - - in his left ear, that he has normal hearing
> in his left - - in his right ear for general conversation and for taking oral instructions.
> And please assume that he's capable of working at, at the heavy level, and that's
> defined as pickup up from 50 to 100 pounds occasionally, and from 25-50 pounds
> frequently. Now I want him at unskilled. Can he return to any of his prior work?

(R. 251).  The VE responded, "[h]e can return to the job, the laborer job." (R. 251).

In reaching his decision that Means could do medium work similar to his former job, the ALJ

properly considered Means' RFC, age, educational background, and work history.  (R. 259-60).  The

ALJ concluded that Means is able to perform his past relevant work as a warehouse worker.  (R. 259-

260).  The VE further testified that Means could return to work as a contract laborer or janitor, also

in Means' previous employment history.  (R. 251).

The Fifth Circuit observed that in determining a claimant's ability to work, a VE " . . . is

familiar with the specific requirements of a particular occupation, including working conditions and

the attributes and skills needed."  *See Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000).  Unlike the

Dictionary of Occupational Titles, which simply gives a general description of the job duties

involved, a VE is able to compare the unique requirements of a specified job with the particular

ailments a claimant suffers in order to reach a reasoned conclusion as to whether the claimant can

perform the specific job. *See Fields v. Bowen*, 805 F.2d 1168, 1171 (5th Cir. 1986). Because the

hypothetical questions articulated by the ALJ reasonably incorporated the restrictions and

31

impairments recognized by the ALJ, the ALJ properly accepted the VE's testimony that Means could perform work.  Moreover, the ALJ's RFC accommodates limitations resulting from Means' alleged impairments.  (R. 259).

Beyond the testimony of the VE, Means himself testified to direct questions from the ALJ about his physical abilities.  (R. 235).  The ALJ asked Means, "How much can you lift?"  Means responded that he could lift "40 or 50" pounds, and likened that weight to a "light box."  (R. 235).  The ALJ also inquired as to how far Means could walk, to which Means responded "[j]ust half a mile."  Also, Means testified to having no problem sitting for six hours.  Therefore, based on the assessment of the VE that Means could return to his previous work and Means' own testimony of his physical limitations, the ALJ properly concluded that Means is capable of performing medium work, subject to noise and simple routine limitations.  (R. 260).

Accordingly, substantial evidence supports the ALJ's findings that Means' alleged physical and/or mental limitations do not rise to the level of a disability and that Means is capable of performing his past relevant work.

## III.   *Conclusion*

Accordingly, it is therefore

**ORDERED** that Means' Motion for Summary Judgment (Docket Entry No. 14) is **DENIED**. It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 15) is **GRANTED**.  It is further

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas on this the 10th  day of July, 2008.

Calvin Botley
United States Magistrate Judge